PAUL A. BONIN, Judge.
1 tPhillips’ Bar and Restaurant has operated at the same location in the University section of Uptown New Orleans for more than seventy years. The alcohol beverage outlet, or ABO, licenses are held by the corporation Phillips’ Bar & Restaurant, Inc. The property on which Phillips’ operates, that is the licensed premises, is owned by 733 Cherokee, L.L.C., as is an adjoining vacant lot, which Phillips’ used as a patio for about seven years. There is overlap between the corporation’s shareholders and the limited liability company’s members. Phillips’s connections filed a petition for declaratory judgment against the City of New Orleans concerning its non-conforming use of the adjoining vacant lot.
The City reconvened and a sought in-junctive relief to prohibit any use of the vacant lot by Phillips’ as a part of its business operations. A neighborhood as *96 sociation, the Maple Area Residents, Inc., intervened on the side of the City and against the Phillips’s connections and sought to enforce a restrictive covenant through a request for injunctive relief. Following the earlier issuance of a preliminary injunction, the district court denied the declaratory relief Phillips’s ^connections sought and granted the City and MARI declaratory relief and a permanent injunction prohibiting any business use of the patio lot by Phillips’. The Phillips’ connections alone have appealed the judgment.
Upon our review, we conclude that the district court was not clearly wrong in finding that Phillips’s connections had not established that any non-conforming use enjoyed by the licensed premises extended to the adjoining vacant lot or somehow incorporated that property into the licensed property. And, on that account, we also conclude that the injunctive relief granted, such that it prohibits the selling or serving of alcohol or food by Phillips’ or anyone else on the adjoining vacant lot, is proper, but that its reach to prohibiting selling or serving of alcohol or food by Phillips’ for its patrons’ consumption off of its licensed premises, including on the adjoining lot, is not supported by the law and the evidence. Accordingly, we amend the permanent injunction and affirm the judgment as amended.
We explain our decision in greater detail in the following Parts.
I
In this Part we describe the history of the ownership and use of the properties as well as provide the specific legal description for the properties involved, then generally describe the particulars of the ensuing litigation among the parties, and finally summarize the evidence at the trial of this matter and the resulting judgments.
JjA
Paul and JoAnn Ippolito purchased both municipal lots that are the subject of the present controversy from Rose Stipelco-vich Phillips. The Ippolitos purchased Lot 1-A, which bears the municipal address 733 Cherokee Street, New Orleans, on October 23, 1986. This is the lot on which Phillips’ is licensed to operate as an ABO. Later, they acquired Lot 2-A, which bears the municipal address 727 Cherokee Street, on March 9, 1990. This was an unimproved residential lot that was never used by Mrs. Phillips in connection with the operation of Phillips’. The Ippolitos subsequently transferred their interests in the lots, and the improvements thereon, to 733 Cherokee, L.L.C. in November 2009. The Ippolitos are the only members of the limited liability company.
As we noted, Phillips’ is owned by the Louisiana corporation, Phillips’ Bar & Restaurant, Inc. Paul F. Ippolito, who is its president, and his wife, JoAnn Ippolito, own two-thirds of its common stock. Their son, Joseph Ippolito, owns the remaining one-third, is also a corporate officer, and is the bar’s day-to-day manager. The Ippolitos purchased the business, Phillips’ Bar and Restaurant, from Mrs. Phillips in 1986 and incorporated it in 1988.
Phillips’ currently operates the bar on Lot 1-A and holds a Class-A general Alcoholic Beverage Outlet license for use on Lot 1-A only. Importantly, an ABO permit has never been issued for Lot 2-A. Both lots are zoned RD-2, two family presidential, though Lot 1-A acquired a legal non-conforming status by virtue of the many decades that a bar and restaurant have been operated on the premises.[1]
*97 The record suggests that the neighborhood association, MARI, has had, at times, a contentious relationship with Phillips’. Several years prior to the Ippolitos’ purchase of the two lots and the bar and restaurant, Mrs. Phillips entered into an agreement with the association wherein she agreed to enter into a restrictive covenant with MARI in exchange for MARI’s cessation of opposition to Mrs. Phillips’s building renovation plans. Specifically, the restrictive covenant provides that Mrs. Phillips agrees to comply with the requirements of New Orleans’ Comprehensive Zoning Ordinance, that the bar and restaurant, which she was then rebuilding to replace the one that had occupied 733 Cherokee Street, would not be larger in size than that which had previously existed on the site, and that she would not offer a greater scope or degree of service than that offered by her prior restaurant at that location.
After the acquisitions by the Ippolitos, the neighborhood residents and MARI members complained to the City about operation and use of Lots 1-A and 2-A by Phillips’. The complaints intensified in 1996 after the Ippolitos began improving Lot 2-A to serve as an accessory patio bar connected to the bar and restaurant occupying Lot 1-A. For example, after having received complaints about unpermitted construction activities on Lot 2-A, Inspector Mike Savage of the City’s Department of Public Safety and Permits Building Inspection Bureau | ¿conducted a field inspection of both Lot 2-A and the bar and restaurant occupying Lot 1-A on October 23, 1996. Inspector Savage subsequently prepared a written report wherein he noted the construction of a fence, the placement of concrete planters and an air conditioning unit on Lot 2-A. Further, a City investigator again inspected Phillip’s and Lot 2-A on August 1, 1997. This inspection resulted in a September 19, 1997, notice of hearing from the City’s Administrative Adjudication Bureau, though the hearing was subsequently continued by the City, and later abandoned. Moreover, Mr. Savage, the City inspector, examined the property on September 9, 1999, resulting in a September 10, 1999 Notice from the City ordering Paul Ippolito to either remove the improvements on Lot 2-A or secure a building permit. The record also contains a September 17, 1999 memorandum from Paul May, the Director of the City’s Department of Safety and Permits, to a deputy city attorney. In the memorandum, Mr. May notes that he had “received complaints from neighbors of the above alcoholic beverage outlet [at 733 Cherokee Street] that it is operating a patio bar next door to the establishment on a lot at 727 Cherokee Street which I understand the bar owns.” A City inspector again visited Lot 2-A on September 21, 1999, and took photographs of the improvements made to Lot 2-A. These photographs were later forwarded to Paul May. Subsequently, the City issued a municipal citation to Joseph Ippolito, d/b/a Phillips’ Bar and Restaurant, alleging various violations in connection with Lot 2-A. Mr. Ippolito pled not guilty and filed a motion to quash. The court later dismissed the citation.
IfiOn April 20, 2000, MARI’s president wrote a letter on MARI letterhead to Mr. May concerning Phillips’ use of Lot 2-A as a patio bar. The letter asked the City to order Phillips’ to cease commercial activities on Lot 2-A, declare the construction of the patio bar to be in violation of zoning regulations, and sanction Phillips’ appropriately.
*98 B
Subsequently, the City filed a petition for preliminary and permanent injunction on August 23, 2000, against Phillips’ and Paul Ippolito. The City’s petition alleged that the patio bar illegally expanded Lot 1-A’s non-conforming use onto Lot 2-A in violation of the City’s CZO. The City’s petition was supported by an affidavit executed by Mr. May wherein, among other things, he averred:
On September 19, 1999, he personally investigated a complaint that the premises at 727 Cherokee Street were being used as an outdoor patio, where alcoholic beverages were being sold and consumed, for the business “Phillips’ Bar & Restaurant, Inc.” located next door at 733 Cherokee Street. Additionally, since the time of that investigation, [sic] there he has received subsequent complaints that 727 Cherokee Street is being used as an outdoor patio where alcoholic beverages are sold and consumed.
Mr. May concluded:
a. “Phillips’ Bar & Restaurant, Inc.” violated Section 13.5.2 [of New Orleans Comprehensive Zoning Ordinance], by illegally extending or enlarging the non-conforming use of the “Phillips’ Bar & Restaurant, Inc.” onto the lot next door, located at 727 Cherokee Street.
b. Such an expansion of a non-conforming use, in any manner, is expressly prohibited by this section of the CZO.
c. “Phillips’ Bar & Restaurant, Inc.” violated Section 4.5.3, by using the lot, located at 727 Cherokee Street, as a Bar and/or Restaurant which, according to Section 4.5.3, is not a permitted [7use of property located in an RD-2, Two-Family Residential District.
Phillips’ and Ippolito answered the suit and asserted that Lot 2-A had acquired legal non-conforming status by passage of time and that the City’s claim had prescribed. Following a hearing, the district court issued a preliminary injunction on December 12, 2000, against the defendants. Notably, the district court’s judgment merely noted that “the preliminary injunction filed by plaintiff herein is hereby granted.”
The City, however, never set the matter for trial in order to obtain a permanent injunction. Thus, on November 3, 2006, on motion of Phillips’ and Ippolito, the district court issued a judgment declaring the 2000 matter to have been abandoned as of June 6, 2006. (The parties stipulated before the trial of the present matter that the last step taken in the prosecution or defense of the 2000 matter occurred on June 6, 2003.)
On May 9, 2007, plaintiffs initiated the present matter by filing a petition for declaratory relief wherein they requested a judgment declaring that: 1) the 2000 matter, by virtue of its abandonment, is to be considered as never having been filed; 2) all causes of action that were, or could have been, brought by the City in the 2000 action are now prescribed; and 3) they now have a vested property right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A.[2] The City answered and reconvened asking the district court to enjoin plaintiffs from using Lot 2-A as a prohibited bar and/or restaurant. The City subsequently |samended their reconventional demand several times, though its request for relief remained, essentially, unchanged. On April 2, 2008, *99 the district court issued a preliminary injunction enjoining Phillips’ and Paul Ippol-ito from selling, in the absence of appropriate licenses, alcoholic beverages for consumption at 727 Cherokee Street. On June 9, 2011, MARI intervened in the matter seeking a permanent injunction enjoining the plaintiffs from violating the restrictive covenant signed by Mrs. Phillips in 1981 and prohibiting them from using Lot 2-A in connection with the operation of the restaurant and bar on Lot 1-A.
C
The matter came to trial on December 12, 2011. At trial, the plaintiffs introduced evidence that the patio, like Phillips’ proper, was open for business at least four hours a day, five days a week. The plaintiffs further established that prior to the 2008 preliminary injunction the patio on Lot 2-A had been used by Phillips’ patrons for, among other things, cell phone use, tobacco consumption, socializing, private events, keg parties, political fundraisers, baby showers, and crawfish boils. In fact, the plaintiffs elicited testimony that the patio saw at least fifteen special events a year. The plaintiffs also elicited testimony that prior to the imposition of the 2008 preliminary injunction its patrons were allowed to consume food and alcoholic beverage on the patio that were sold from Phillips’ proper. We emphasize at this point, however, that there is little if any evidence that alcoholic beverages were ever sold on the patio; indeed, the plaintiffs acknowledge that they |flwould need an ABO permit for Lot 2-A for such sales and that they do not and never have had, in fact, such a permit.
Specifically, the plaintiffs elicited testimony that once the patio had been put into service, and prior to the imposition of the 2008 preliminary injunction, no six-month period had elapsed where Phillips’ patrons had not used the patio. The testimony elicited at trial also established that private events are still held on the patio and that Phillips’ patrons, even after the imposition of the 2008 preliminary injunction, have been free to use the patio except that Phillips’ now prohibits its patrons from consuming alcohol on the patio.
After trial, the district court took the matter under advisement and issued a judgment, and reasons therefor, on February 8, 2012. Specifically, the district court’s original judgment: 1) dissolved the 2000 preliminary injunction as abandoned; 2) found that the plaintiffs failed to meet their burden of proving that they have a vested property right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A; 3) found conversely that the City established that the legal nonconforming use held by 733 Cherokee does not extend to 727 Cherokee; and 4) held that MARI’s action to enforce its restrictive covenant had prescribed. All parties sought motions for new trial. Specifically, the plaintiffs challenged those portions of the district court’s judgment that held that they failed to prove, and that the City established, that the plaintiffs did not have a vested property right to use Lot 2-A in connection with the legal non-conforming use held by Lot 1-A. The City challenged the district court’s factual finding that it has continuously hnpermitted Phillips’ to operate as a bar, and not a restaurant with an accessory bar, since 1998, and the district court’s failure to rule on the City’s request for a permanent injunction. Similarly, MARI also sought a ruling on its request for a permanent injunction against the plaintiffs. Significantly, MAPJ did not ask the district court to revisit its finding that MARI’s right to enforce the restrictive covenant had prescribed. Rather, MARI’s renewed request for a permanent injunction was based on the plaintiffs’ al *100 leged violation of the City’s zoning ordinances.
After a hearing on the motions for new trial, the district court issued an amended judgment on May 4, 2012, which: 1) denied the plaintiffs’ motion for new trial; 2) denied the City’s request to reverse its finding that Lot 1-A has acquired a legal nonconforming status as a bar[3]; and 3) granted the City’s and MARI’s request for a permanent injunction against the plaintiffs.[4] Specifically, the permanent injunction provides, in pertinent part:
a permanent injunction is hereby issued, without bond in accordance with law, directed to Phillip’s Bar & Restaurant, Inc., Paul F. Ippolito, and 733 Cherokee, L.L.C., their agents, employees, and all other persons, firms, or corporations acting or claiming to act on their behalf, and enjoining them from using 727 Cherokee Street, New Orleans, Louisiana as a bar and/or restaurant independently and/or in connection with 733 Cherokee Street and from selling or serving alcoholic beverages for consumption at 727 Cherokee Street.
|nThe plaintiffs timely sought a devolu-tive appeal from the district court’s original and amended judgments. Neither the City, nor MARI, has answered the plaintiffs’ appeal or appealed any aspect of the district court’s original or amended judgments.
II
Before we address the particular issues arising from the judgments’ denial of declaratory relief and grant of injunctive relief, we discuss at the outset in this Part those general principals applicable to zoning and property usage disputes. We reserve for discussion, however, the law regarding acquisition and continuance of nonconforming uses in Part III-B, post.
A
Zoning is designed to foster improvements by confining certain classes of buildings and uses to certain localities without imposing undue hardship on property owners. City of New Orleans v. Elms, 566 So.2d 626, 628 (La.1990). The essence of zoning “is territorial division in keeping with the character of the lands and structures and their peculiar suitability for particular uses, and the uniformity of use within the division.” Id. The traditional purpose of zoning is to reduce or eliminate the adverse effects of one type of land use on another by segregating different uses into different zoning districts. Redfearn v. Creppel, 455 So.2d 1356, 1359 (La.1984).
Zoning by its nature is a legislative function. Elms, 566 So.2d at 629. La. Const. art. VI, § 16 grants local governing authorities the power to adopt zoning | ¶ regulations and standards for use of areas and structures subject to procedures established by law. La. R.S. 33:4721 provides that “[f]or the purpose of promoting health, safety, morals, or the general welfare of the community, the governing authority of all municipalities may regulate *101 and restrict the height, number of stories, and size of structures, the percentage of lot that may be occupied, the size of yards, courts, and other open spaces, the density of population, and the location and use of the buildings, structures, and land for trade, industry, residence, or other purposes.” Additionally, La. R.S. 33:4723 indicates that zoning regulations shall, among other things “be made with reasonable consideration of the character of the district and its peculiar suitability for particular uses, and with a view to conserving the values of buildings and encouraging the most appropriate use of land throughout the municipality.” As observed by the Supreme Court in Elms, the “principal regulation which has been utilized to carry out the purposes of zoning is the exclusion of commercial uses from residential uses.” 566 So.2d at 629. Purely business uses “are generally excluded from residential districts by simply omitting them from the list of permitted uses.” Id.
B
Nevertheless, as observed by us in City of New Orleans v. Hamilton, “[w]hile local municipalities are given the power and function of defining the use of property as they best see fit, property users are not wholly unprotected or expected to change their use of property every time their area is rezoned.” 602 So.2d 112, 114 (La.App. 4 Cir.1992). It is, therefore, “well settled law that use of | ^property which does not conform to the use zoned appropriate for that area may still enjoy the same legal status as property that does conform.” Id. Nonconforming use status is designed to protect those uses which were legally established before the enactment of a restrictive regulation. Id. Thus, a legal nonconforming use is one “which was lawful prior to the enactment of a particular zoning regulation and which is continued after the effective date of the regulation, although the continued use violates the new zoning restrictions for the district in which the property is situated.” Id.
The permitted continuation of a nonconforming use is designed to avoid the hardship, injustice and doubtful constitutionality of compelling the immediate removal of objectionable buildings and uses already in the area. Redfearn, 455 So.2d at 1359. As noted, “the purpose of zoning ordinances is to confine certain classes of buildings and uses to certain localities.” Id. Because a nonconforming use is inconsistent with this objective, “it should, consistently with the property rights of the individuals affected and substantial justice, be viewed narrowly and have all doubts resolved against continuation or expansion of the nonconformity.”[5] Id. As noted in Redfearn, the “general rule is that the continuance of a nonconforming use is a continuance of the same use and not some other type of use.” Id. The established use may be continued; a different use inconsistent with the zoning regulations is not authorized. Id.
\UA governing authority may, however, lose the right to prohibit a given nonconforming use through the operation of prescription. La. R.S. 9:5625 provides, in pertinent part:
*102 A. (1) All actions civil or criminal, created by statute, ordinance, or otherwise ... which may be brought by parishes, municipalities, or their instrumentalities or by any person, firm, or corporation to require enforcement of and compliance with any zoning restriction, building restriction, or subdivision regulation, imposed by any parish, municipality, or an instrumentality thereof, and based upon the violation by any person, firm, or corporation of such restriction or regulation, must be brought within five years from the first act constituting the commission of the violation.
(2) Where a violation has existed for a period of two years prior to August 1, 1956, ... the action must be brought within one year from and after August 1, 1956.
(3) With reference to violations of use regulations all such actions, civil or criminal ... must be brought within five years from the date the parish, municipality, and the properly authorized instrumentality or agency thereof if such agency has been designated, first had been actually notified in writing of such violation.
(4) Except as relates to nonconforming signs and billboards, any prescription heretofore accrued by the passage of two years shall not be interrupted, disturbed, or lost by operation of the provisions of this Section.
In determining whether prescription has accrued in a zoning enforcement action, the burden of proof is upon the person pleading prescription. Elms, 566 So.2d at 630. The key element in proving that prescription has accrued is knowledge on the part of the Parish. Id. at 630. With respect to violation of use regulations, the parish must -specifically receive written notice for the prescriptive period to commence. La. R.S. 9:5625 A(3). Once that is shown, however, the burden switches to the party pleading termination of the non-conforming use status by abandonment or discontinuance. Elms, 566 So.2d. at 634. Nonconforming use 1^status, once attained, may be lost if the property is not used for the nonconforming purpose for a continuous period of six months. Orleans Parish CZO, Article 13, Section 13.2.1. The burden of proving termination of nonconforming use status by abandonment or discontinuance is on the party urging termination of the status. Elms, 566 So.2d at 634.
Ill
In this Part, and keeping in mind those general principles of zoning law, we turn to explain why we affirm the declaratory judgment rendered by the district court. This aspect of the present appeal arose out of the plaintiffs’ request for declaratory relief. We begin by discussing in general those principals of law that govern actions for declaratory judgment. We then discuss the particular principals applicable to nonconforming uses. And lastly we address why we reject the plaintiffs’ arguments that the district court erred when it refused to decree that plaintiffs have a vested property right to use Lot 2-A in connection with their legal non-conforming use of Lot 1-A.[6]
A
La. C.C.P. art. 1871 authorizes declaratory judgment actions:
Courts of record within their respective jurisdictions may declare rights, sta *103 tus, and other legal relations whether or not further relief is or could be claimed. No action or proceeding shall be open to objection on the ground that a declaratory judgment or decree is prayed for; and the existence of another adequate remedy does not preclude a judgment for declaratory relief in cases where it is appropriate. The declaration shall have the force and effect of a final judgment or decree.
11fiFurther, La. C.C.P. art. 1872 indicates who may bring such actions:
A person interested under a deed,' will, written contract or other writing constituting a contract, or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract or franchise, may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder.
Therefore, “a declaratory judgment is one which simply establishes the rights of the parties or expresses the opinion of the court on a question of law, without ordering anything to be done, its distinctive characteristic being that the declaration stands by itself and no execu-tory process follows as a matter of course.” Succession of Rickerfor, 120 So.2d 320, 323 (La.App. 4 Cir.1960). Accordingly, the declaratory judgment action is “distinguished from a direct action in that it does not seek execution or performance from the defendant or the opposing litigants.” Id.
A suit for declaratory judgment is, therefore, an appropriate means to decide the rights and obligations of parties to a controversy. In re Peter, 98-0701 (La.App. 4 Cir. 12/23/98), 735 So.2d 665, 667. When a declaratory judgment “would terminate the uncertainty or controversy, the trial court must render such judgment.” Id. Conversely, La. C.C.P. art. 1876 indicates that a “court may refuse to render a declaratory judgment or decree where such judgment or decree, if rendered, would not terminate the uncertainty or controversy giving rise to the proceeding.” However, “the courts will only act in cases of a present, justiciable 1 ^controversy and will not render merely advisory opinions.” Church Point Wholesale Beverage Co., Inc. v. Tarver, 614 So.2d 697, 701 (La.1993).
Nevertheless, La. C.C.P. art. 1881 declares that these Articles are remedial: “Their purpose is to settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and they are to be liberally construed and administered.” Accordingly, La. C.C.P. art. 1875 provides that “the enumeration in Articles 1872 through 1874 does not limit or restrict the exercise of the general powers conferred in Article 1871 in any proceeding where declaratory relief is sought, in which a judgment or decree will terminate the controversy or remove an uncertainty.” Therefore, if a district court grants a declaratory relief, La. C.C.P. art. 1878 indicates that further relief may be granted whenever “necessary or proper”:
The application therefor shall be by petition to a court having jurisdiction to grant the relief. If the application is considered sufficient, the court, on reasonable notice, shall require any adverse party whose rights have been adjudicated by the declaratory judgment or decree, to show cause why further relief should not be granted forthwith.
La. C.C.P. art. 1879 notes that when “a proceeding under Articles 1871 through 1883 involves the determination of an issue of fact, such issue may be tried and determined in the same manner as *104 issues of fact are tried and determined in other civil actions in the court in which the proceeding is pending.” With respect to appellate review, La. C.C.P. art. 1877 indicates that all “orders, judgments, and decrees under Articles 1871 through 1883 may be reviewed as other orders, judgments, and decrees.” Further, as this Court has noted, the scope 11sof appellate review is confined to a determination of whether or not the trial court abused its discretion by granting or refusing to render a declaratory judgment. Ricard, v. State, 544 So.2d 1310, 1312 (La.App. 4 Cir.1989).
B
In this Part we discuss the law regarding the acquisition and continuance of nonconforming uses. As noted, a legal non-conforming use can arise by virtue of the fact that a given use pre-existed the enactment of a current and otherwise applicable, zoning law. On the other hand, a legal non-conforming use can also arise by virtue of sustained governmental acquiescence. Thus, the jurisprudence obligates the proponent of a given use to establish that their nonconforming use of a piece of property has been “regular and consistent” or “continuous and consistent.” See, e.g., Elms, 566 So.2d at 628; Weisler, 98-3007, 745 So.2d at 1262. La. R.S. 9:5625 also touches on this issue. While Section A sets out the applicable prescriptive periods governing actions for the enforcement of zoning provisions, La. R.S. 9:5625 B provides for the “grandfathering” of certain types of nonconforming uses:
B. In all cases where the prescription provided for herein has accrued, the particular property involved in the violation of the zoning restriction, building restriction or subdivision regulation shall enjoy the same legal status as land uses, construction features of buildings or subdivisions made nonconforming by the adoption of any zoning restriction, building restriction or subdivision regulation ...
The grandfathering provided for in La. R.S. 9:5625 B applies solely to those types of violations regulated by the prescriptive provisions set out in Part A(l), i.e., violation respecting of zoning restrictions, building restrictions and subdivision | ^regulations. Part B is, therefore, not applicable to the present matter, which concerns a violation of use regulations that are addressed in La. R.S. 9:5625 A(2). This is not to say, however, that a use regulation could not be grandfathered in by regular and consistent use. Specifically, in Orleans Parish, where Lot 2-A is situated, Article 13, Section 13.6.1 of the CZO provides specifically:
The casual, intermittent, temporary, or illegal use of land or buildings shall not be sufficient to establish and maintain the existence of a nonconforming use. In order to provide for the continuation of a nonconforming use, it must be opened for business a minimum of four (4) hours per day, five (5) days per week. The hours of operation must be posted on the entrance to the use. Equipment or furnishings required by City ordinances for the specific type of activity must be available and the structure shall be maintained in accordance with applicable ordinances of the City. The existence of a nonconforming use on part of a lot or tract shall not be construed to establish a nonconforming use on the entire lot or tract.
As an exception, Article 13, Section 13.6.2 provides:
Any business establishment operating as a designated reception facility shall not be considered casual, temporary, or illegal due to the nature of the business operating intermittently for scheduled *105 events with food and beverage service at the request of clients. These private events with food and beverage service, scheduled by non-owners and/or operators, must be held a minimum of fifteen (15) occasions a year to uphold a legal operating status as a reception facility. Exceptions to this operational standard are appealable to the Board of Zoning Adjustments.
Further, Article 13, Section 13.7 of the CZO, while not applicable specifically to the present matter, indicates further the type of evidence that may be used to establish nonconformity:
The Director of the Department of Safety and Permits, at the time application is filed for a certificate of occupancy (attesting to the legal nonconforming status of an existing use), shall make an initial determination as to the existence of such nonconforming use; and in so doing shall require the property owner, or his agent, to produce acceptable evidence attesting to said legal nonconforming status. 120Such evidence shall include, but need not be necessarily restricted to, such documents, as rent receipts, affidavits, documentation of utility services or other information as may be deemed to be necessary in a particular case.
Article 13, Section 13.2.1 of the Orleans Parish CZO, nevertheless, provides that vacancy can result in a loss of legal nonconforming status:
No nonconforming building or portion thereof, or land used in whole or in part for nonconforming purposes, which hereafter becomes and remains vacant for a continuous period of six (6) calendar months shall again be used except in conformity with the regulations of the district in which such building or land is situated. The intent of the owner or other person to use a building or land for nonconforming purposes shall not be determinative of whether such building or land was vacant. The burden of proof to establish the existence and retention of a nonconforming use shall be on the property owner of the building or land claiming retention of said nonconforming use by clear and convincing evidence.
Accordingly, in order to establish that they had a vested property right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A, the plaintiffs were obligated to meet the burden of proof set out by CZO Article 13, Section 13.6.1.
C
We analyze and reject the plaintiffs’ arguments that the district court erred when it declined to find that they have a vested property right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A. In its reasons for judgment, the district court held the plaintiffs did not meet their burden of proof: “The failure to post signs regarding the use of the patio and the intermittent use for smoking and cell phone calls are not sufficient to create non-conforming use.” Similarly, the district court also found that the plaintiffs did not establish that the \9A patio was used frequently enough to support a finding that it attained a legal nonconforming use as a reception facility.
The plaintiffs’ arguments in support of their position have not changed substantially since they were first advanced before the district court. The plaintiffs argue, specifically, that Lot 2-A acquired legal nonconforming use status because: 1) the City received written notice of the plaintiffs’ violation of applicable use regulations in 1999; 2) the City abandoned the 2000 injunction; 3) the effect of this abandonment meant that La. R.S. 9:5625 prescrip *106 tion did not toll on the City’s enforcement action; and 4) its nonconforming use of Lot 2-A had acquired a legal status by operation of La. R.S. 9:5625 and the passage of five years from the City’s receipt of written notice. The plaintiffs also argue that the district court erred when it found that they failed to prove that Lot 2-A acquired legal nonconforming status as a reception facility, and that Section 13.6.1 of the Orleans Parish CZO must be invalidated because it is in conflict with La. R.S. 9:5625.
Having reviewed the record and the exhibits introduced by the parties, we are not prepared to say that the district court committed manifest error when it refused to find that plaintiffs have acquired a vested right to use Lot 2-A in connection with the legal nonconforming use of Lot 1-A. While it is true that the patio bar was open, like Phillips’ proper, for at least four hours a day for five days a week, and that Phillips’ patrons were, before the imposition of the 2008 preliminary injunction, regularly allowed to consume alcoholic beverages on Lot 2-A, and that Lot 2-A played host to numerous types of social gatherings between 122^000 and 2008, the record is devoid of any evidence Phillips’ hours of operation were posted, pursuant to Article 13, Section 13.6.1, at the entrance to either Phillips’ or Lot 2-A.
Further, we are not convinced that the district court misapplied La. R.S. 9:5625 in the context of the plaintiffs’ request for a declaration of vested rights. As noted, the present matter concerns a violation of the City’s use regulations and Section B, La. R.S. 9:5625’s grandfather clause, does not apply to the violation of use regulations. The plaintiffs’ arguments on this point are, thus, misplaced. Similarly, we do not believe that the district court erred when it refused to find that Lot 2-A has acquired legal non-conforming status as a reception hall pursuant to Section 13.6.2 of the CZO. Although there is evidence in the record that at least fifteen private events a year have been held on Lot 2-A, there is no evidence in the record that Lot 2-A was operated as a “designated reception facility.” We, therefore, decline to hold that the district court committed manifest error when it declined to grant the plaintiffs’ request for a judgment declaring that plaintiffs have acquired a vested right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A.
IV
The plaintiffs assail the district court’s imposition of an injunction permanently enjoining the plaintiffs from using Lot 2-A as a bar and/or restaurant independently and/or in connection with Lot 1-A, and from selling or serving alcoholic beverages on Lot 1-A for consumption at Lot 2-A. The plaintiffs assert, | ^specifically, that the district court erred when it permanently enjoined the sale of alcohol on Lot 1-A (in the bar) for consumption on Lot 2-A (on the patio) because the City’s and MARTs right to seek an injunction on this use of Lot 2-A has prescribed. We agree and, accordingly, modify the injunction by deleting its prohibition on the sale of alcohol on Lot 1-A for consumption on Lot 2-A, and its prohibition against using Lot 2-A in connection with Phillips’ operations as a bar and restaurant. We now explain our decision in this regard.
A
We first, however, set out the law applicable to permanent injunctions. La. C.C.P. art. 3601 A provides in pertinent part: “An injunction shall be issued in cases where irreparable injury, loss, or damage may otherwise result to the applicant, or in other cases specifically provided *107 by law.” Traditionally, injunction has been held to be a harsh, drastic and extraordinary remedy which should only issue where the petitioner is threatened with irreparable harm and has no adequate remedy at law. Kruger v. Garden Dist. Ass’n, 00-1135, p. 7 (La.App. 4 Cir. 1/17/01), 779 So.2d 986, 991. A petitioner is, however, entitled to injunctive relief without the requisite showing of irreparable injury “when the conduct sought to be restrained is unconstitutional or unlawful, ie., when the conduct sought to be enjoined constitutes a direct violation of a prohibitory law and/or a violation of a constitutional right.” Jurisich v. Jenkins, 99-076 (La.10/19/99), 749 So.2d 597, 599. A municipality may enjoin violations of a zoning ordinance. City of New Orleans v. National Polyfab Corp., 420 So.2d 727, 728 (La.App. 4 Cir.1982).
l^A hearing on a permanent injunction is “an ordinary proceeding.” Elysian Fields Church of Christ v. Dillon, 08-0989, p. 6 (La.App. 4 Cir. 3/18/09), 7 So.3d 1227, 1231. The issuance of a permanent injunction takes place only after a trial on the merits in which the burden of proof is a preponderance of the evidence. French’s Welding & Maintenance Service, L.L.C. v. Harris Builders, L.L.C., 12-0200, p. 3 (LaApp. 4 Cir. 12/12/12), 106 So.3d 716, 718. A permanent injunction is a final judgment and “so long as it remains in force, it extends the life of the proceeding in which it was granted until it is modified or revoked in a proceeding brought for that purpose in the district court which issued it.” Tenneco, Inc. v. Oil, Chemical and Atomic Workers Union, Local 4-522, 234 So.2d 246, 248 (La.App. 4 Cir.1970). Appellate courts review a trial court’s granting of a permanent injunction utilizing the manifest error standard. Mary Moe, L.L.C. v. Louisiana Bd. of Ethics, 03-2220, p. 9 (La.4/14/04), 875 So.2d 22, 29.
B
The plaintiffs argue that the district court erred as a matter of law in granting the permanent injunction because the defendants right to enjoin the consumption of alcohol on Lot 2-A had prescribed by operation of La. R.S. 9:5625 A(3). As noted, the touchstone consideration for this inquiry centers on evidence of written notice. Plaintiffs contend that the City received written notice of the subject use violations in 1999. Regardless of this contention, the trial court observed, and the record indicates, however, that the City received written notice of the fact that alcohol was being sold for consumption on Lot 2-A in 2000.
| 2qAs noted, MARI’s president wrote a letter to Mr. May, the City’s Zoning Administrator, on April 20, 2000, concerning Phillips’ use of Lot 2-A as a patio bar. The letter noted specifically that “Phillip’s Restaurant and Bar has expanded its operations into the adjacent, residentially zoned lot.” The letter further states that “[i]n violation of applicable city zoning regulations, the restaurant has constructed an outdoor bar which it has described as a ‘patio’ in its sidewalk advertisement outside the restaurant.” The letter additionally indicates that alcoholic beverages are being consumed on the lot. Clearly, the City had written notice in 2000, at the latest, of the plaintiffs’ violation of use regulations pertaining to Lot 2-A.
The plaintiffs also contend that the preliminary injunction, which was issued in 2000, did not toll the running of La. R.S. 9:5625 A(3) prescription. The district court found no legal support for this assertion. We disagree and find that the district court committed legal error when it held otherwise.
First, we observe that the district court’s 2000 preliminary injunction *108 could not serve to toll the running of prescription because it was fatally defective, and thus null and void. Specifically, the preliminary injunction stated: “the preliminary injunction filed by plaintiff herein is hereby granted.” We find that the 2000 preliminary injunction is invalid as an injunction because it fails to describe the actions being enjoined. La. C.C.P. art. 3605 states, in pertinent part: “An order granting either a preliminary or a final injunction or a temporary restraining order shall describe in reasonable detail, and not by mere reference to the petition or 12fjOther documents, the act or acts sought to be restrained.” Accordingly, a judgment that purports to grant an injunction but fails to describe the prohibited acts with specificity is void. Lucky Coin Machine v. Hillensbeck, 00-0313, p. 5 (La.App. 4 Cir. 1/31/01), 778 So.2d 1262, 1264; Vanvrancken v. Roy, 296 So.2d 460, 462 (La.App. 4 Cir.1974). The 2000 preliminary injunction merely renders judgment in favor of the city. It neither specifies the acts enjoined nor describes the properties involved. The 2000 preliminary injunction is, clearly, null and void as an injunction.
Second, we note that, even had the 2000 preliminary injunction contained the appropriate decretal language, it would not have tolled the running of prescription because the City abandoned the action in 2003. All parties stipulated prior to trial in the present matter that the last step taken in the prosecution of the 2000 matter occurred on June 6, 2003. Moreover, the district court confirmed the 2000 action’s abandonment when it issued a judgment on November 3, 2006, declaring the 2000 matter to have been abandoned as of June 6, 2006. As this Court stated in Box v. French Market Corporation, 00-1880, pp. 5-6 (La.App. 4 Cir. 9/5/01), 798 So.2d 184, 186, when a “party that has obtained a preliminary injunction fails to seek a permanent injunction (and no other action is taken in the case) for a period of at least three years, that case is deemed abandoned by law.” The issue, therefore, is not whether the City abandoned the 2000 matter, but the effect of the abandonment.
127The plaintiffs contend that the 2000 preliminary injunction did not toll the running of La. R.S. 9:5625 A(3) prescription by virtue of the operation of La. Civil Code art. 3463. We agree. La. Civil Code art. 3663 provides:
An interruption of prescription resulting from the filing of a suit in a competent court and in the proper venue or from service of process within the prescriptive period continues as long as the suit is pending. Interruption is considered never to have occurred if the plaintiff abandons, voluntarily dismisses the action at any time either before the defendant has made any appearance of record or thereafter, or fails to prosecute the suit at the trial.
By the clear wording of La. Civil Code art. 3463, a suit that has been abandoned cannot serve to toll the running of prescription. The Supreme Court in Charbonnet v. State Realty Co., 155 La. 1044, 1049, 99 So. 865, 867 (La.1923), first addressed this principal: “a suit which has been abandoned for nonaction during a period of five [now three] years does not constitute a legal interruption to the course of prescription, and its effect is to leave a plaintiff in the same position that he would occupy if he had not instituted the suit.”[7] The Supreme Court further discussed the issue in Long v. Chailan, 196 *109 La. 380, 397-398, 199 So. 222, 227 (La.1940):
According to the terms of the statute[8] it is not the dismissal of the suit that causes it to lose the effect of interrupting prescription. What causes the interruption to ‘be considered as having never happened’ is the plaintiffs allowing five years to elapse without taking any steps in the prosecution of his suit. The allowing of five years to elapse without taking any steps in the prosecution of a suit constitutes an abandonment of the suit, and the effect of the abandonment is that ‘the interruption [of prescription] shall be | ^considered as having never happened.’ It is not necessary for the defendant to have the suit dismissed or stricken from the docket in order that the abandonment may destroy whatever effect the suit may have had in the way of interrupting prescription. When the five years of inaction on the part of the plaintiff have expired, the suit becomes as ineffectual so far as it may have interrupted prescription as if the interruption had ‘never happened’.
Therefore, as the Supreme Court noted in Losch v. Greco, 173 La. 223, 228, 136 So. 572, 573-574 (La.1931):
In other words, the abandonment which results as a legal consequence of a plaintiffs failure to take any action in his suit during a period of five years merely bars his right to continue with the prosecution of that suit. It does not prevent his bringing another suit for the same cause of action; but, if he brings another suit for the same cause of action, the question whether his right of action is barred by prescription must be determined as if no suit had been theretofore brought.
The City’s institution of the injunction proceeding against the plaintiffs in 2000 did not toll prescription on its attempts to prohibit the sale of alcohol for consumption on Lot 2-A because the City subsequently abandoned its suit. Therefore, the City’s reconventional demand for preliminary and permanent injunctions had prescribed by the time the City again sought to enjoin the plaintiffs from selling alcohol for consumption on Lot 2-A. Accordingly, the district court erred when it granted the City and MARI a permanent injunction in the present case that forbade the sale of alcohol on Lot 1-A for consumption on Lot 2-A.
C
We, therefore, modify the district court’s permanent injunction in light of the fact that Phillips’, as holder of the ABO permit, is not prohibited generally by municipal regulations concerning the sale of alcoholic beverages from selling [^alcohol for consumption off its premises.[9] As noted, Phillips’ holds a Class A-general permit which City ordinance defines as, among other things, a “retail outlet where alcoholic beverage is sold on the premises for consumption on or off the premises by paying customers.” Phillips’ premises are *110 limited to Lot 1-A and we can find no statute or ordinance that would limit its patrons to consumption of alcoholic beverages solely on its premises.
Similarly, our modification is made in light of the fact that 733 Cherokee, as owner of Lot 2-A, is not prohibited from allowing its invitees from consuming alcoholic beverages on its premises. As noted, Lot 2-A is zoned RD-2. The CZO does not prohibit the mere consumption of food and alcoholic beverages on properties zoned RD-2. Specifically, Article 4, Section 4.5.1 of the CZO defines the RD-2 district accordingly: “The RD-2 Two-Family Residential District is intended to provide for two-family developments on smaller lots in older, more densely populated sections of the City. This development may be mixed with single-family dwellings, together with such churches, recreational facilities and with accessory uses as may be necessary or are normally compatible with residential surroundings. Town houses are authorized only as conditional uses.” Nevertheless, the RD-2 district provides for a wide range of property uses. Other permitted uses within an RD-2 district include public parks, playgrounds, and their concession stands, in addition to private recreational clubs. Further, certain types |3nof restaurants and coffee shops are also considered accessory uses in an RD-2 district. Moreover, the CZO provides that private clubs, among other things, are considered a conditional use within an RD-2 district. Our review of the CZO, therefore, has failed to reveal any indication that the mere consumption of alcoholic beverages is prohibited on lots within an RD-2 district.
Therefore, we modify the district court’s permanent injunction by deleting the language that forbade Phillips’ from selling food or alcohol at 733 Cherokee Street (Lot 1-A) for consumption at 727 Cherokee Street (Lot 2-A).
DECREE
Accordingly, the original and amended judgments of the district court denying the plaintiffs’ request for a judgment declaring that plaintiffs do not have a vested property right to use Lot 2-A in connection with their legal nonconforming use of Lot 1-A is affirmed. Similarly, we affirm the original and amended judgments of the district court which found that the legal nonconforming use pertaining to 733 Cherokee Street does not extend to 727 Cherokee Street.
With respect to the original and amended judgments of the district court in favor of the City of New Orleans and Maple Area Residents, Inc., the permanent injunction is modified to remove the restriction on selling food and alcohol at the bar premises on Lot 1-A for consumption by patrons on Lot 2-A and, accordingly, the following permanent injunction issues:
IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that there be judgment herein in favor of defendant and plaintiff-in-reconvention, the City of New Orleans, and intervenor, Maple Area Residents, Inc., and against plaintiffs and defendants-injreconven-tion31 and intervention, Phillips’ Bar & Restaurant, Inc., Paul F. Ippolito, and 733 Cherokee, L.L.C., upon the recon-ventional demand and intervention for permanent injunctive relief, and, accordingly, a permanent injunction is hereby issued, without bond in accordance with law, directed to Phillip’s Bar & Restaurant, Inc., Paul F. Ippolito, and 733 Cherokee, L.L.C., their agents, employees, and all other persons, firms, or corporations acting or claiming to act on their behalf, and enjoining them from *111 using Lot 2-A (727 Cherokee Street, New Orleans, Louisiana) as a bar and/or restaurant independently of Lot 1-A (73B Cherokee Street, New Orleans, Louisiana) and from selling or serving alcoholic beverages on Lot 2-A for consumption.
Each party is to bear its own costs. See La. C.C.P. art. 2164.
AMENDED AND AFFIRMED, AS AMENDED
LOMBARD, J., concurs in the result.

. The parties have stipulated, however, that since 2008 the sale of food and non-alcoholic *97 beverages at 733 Cherokee have accounted for less than 50% of the Phillips’ revenue.

. Although they hold different procedural postures, Phillips’ Bar & Restaurant, Inc., Paul F. Ippolito, and 733 Cherokee, L.L.C., will, for brevity's sake, be referred to hereafter collectively as "plaintiffs.”

. The district court noted that "on March 1, 1998, the City issued 733 Cherokee Street a temporary liquor and beer permit as a bar, not a restaurant with a bar. Continuously thereafter, it was permitted by the City and State of Louisiana as a bar." Neither the City, nor MARI, has appealed this finding.

. The district court also clarified its previous rulings — that the plaintiffs did not meet their burden of proving that they had a vested right to use Lot 2-A in connection with their legal non-conforming use on Lot 1-A and that the legal non-conforming use held by 733 Cherokee did not extend to 727 Cherokee — by providing that these rulings were made in favor of the City and MARI and specifically against Phillips’, Paul F. Ippolito, and 733 Cherokee, L.L.C. No party appeals these clarifications.

. This principle should not be confused with the principle that a zoning ordinance, being in derogation of the rights of private ownership, must be construed, when subject to more than one reasonable interpretation, according to the interpretation which allows the least restricted use of the property. Weisler v. Board of Zoning Adjustments, 98-3007 (La.App. 4 Cir. 11/17/99), 745 So.2d 1259, 1261. Nevertheless, it has also been held that zoning ordinances must be construed so as to resolve any doubt in favor of the property owner. Elms, 566 So.2d at 632.

. Our discussion on this point, likewise, addresses the plaintiffs' challenge to the district court's related finding that the City and MARI met their burdens of establishing that the legal non-conforming use held by Lot 2-A does not extend to Lot 1-A.

. The Code of Civil Procedure was amended in 1997 to reduce the abandonment period from five to three years. See Acts 1997, No. 1221.

. The Supreme Court in Long was discussing art. 3519 of the La. Civil Code of 1870, the source article for the second sentence of current La. Civil Code art. 3463. As noted by the redactors of the present code, the current article does not change the law. Thus, the Supreme Court’s discussion in Long is still of relevance to the present controversy.

. We note, however, that City Ordinance 10-404, of Chapter 10, Article III, prohibits an ABO licensee from allowing the sale or consumption of alcoholic beverages in the licensee’s parking lots or driveway areas, except during carnival parade season. Similarly, City Ordinance 10-403, of Chapter 10, Article III, prohibits an ABO licensee from setting up sidewalk chairs and benches adjacent to the licensed premises.